## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

INDIAN MOTORCYCLE
INTERNATIONAL, LLC,

Case No. 24-cv-1958 (LMP/SGE)

Plaintiff,

v.

**ORDER GRANTING
PLAINTIFF'S MOTION FOR
DEFAULT JUDGMENT**

ARTURO EGUIA and INDIAN BIKE
WEEK LLC,

Defendants.

Michael A. Erbele and Paige S. Stradley, **Merchant & Gould P.C., Minneapolis, MN**, for Plaintiff.

Arturo Eguia, pro se.

Indian Bike Week LLC, unrepresented.

Plaintiff Indian Motorcycle International, LLC ("IMI"), initiated this lawsuit on May 24, 2024, asserting various causes of action against Defendants Arturo Eguia ("Eguia") and Indian Bike Week LLC ("IBW") (collectively, "Defendants") relating to Defendants' unauthorized use of IMI's trademarks. *See generally* ECF No. 1. Defendants, through counsel, answered IMI's original complaint and asserted a counterclaim against IMI for breach of contract. *See generally* ECF No. 16. Defendants' counsel was thereafter granted leave to withdraw on December 6, 2024, but because a business entity may not appear without counsel, IBW was ordered to secure and appear with new counsel by January 17, 2025. ECF No. 41. IBW did not do so, and as of the date of this Order, no

attorney has appeared on behalf of either Defendant. IMI subsequently filed an amended complaint on March 10, 2025, ECF No. 69, but Defendants have neither answered the amended complaint nor engaged in discovery since then, ECF No. 80 at 10.

IMI now moves for entry of default judgment against both Defendants. ECF No. 78. Because Defendants have not answered IMI's amended complaint, refused to respond to IMI's discovery requests, violated or failed to meaningfully respond to several orders of this Court, and otherwise ceased defending themselves, the Court grants IMI's motion for default judgment.

## FACTUAL BACKGROUND

For purposes of assessing IMI's motion for default judgment, the Court assumes that the factual allegations in IMI's amended complaint are true. *Murray v. Lene*, 595 F.3d 868, 871 (8th Cir. 2010).

## I.    IMI's Trademarks

IMI is a motorcycle manufacturer and the owner of several trademarks which cover the goods and services it offers under its INDIAN MOTORCYCLE brand. ECF No. 69 ¶ 9. Relevant here, IMI is the owner of the INDIAN MOTORCYCLE trademark, Registration No. 4,325,612 (the "'612 Mark"), for use in connection with motorcycles, apparel, posters, and other related goods; and INDIAN, Registration No. 3,673,330 (the "'330 Mark"), for use in connection with clothing and cloth patches. *Id.* ¶¶ 9–10. IMI also owns two trademarks in special form format: (1) INDIAN MOTORCYCLE, Registration No. 4,478,922 (the "'922 Mark"), for use in connection with clothing, backpacks, bags, and other related goods; and (2) SINCE 1901 INDIAN MOTORCYCLE, Registration

No. 4,515,856 (the "'856 Mark"), for use in connection with motorcycles and structural parts, clothing, and other related goods. *Id.* ¶¶ 11–12. The '922 and '856 Marks are depicted below:



('922 Mark)



('856 Mark)

*Id.*

In addition to the trademarks identified above, IMI owns more than sixty other registered trademarks for use in connection with goods and services IMI offers under its INDIAN MOTORCYCLE brand (collectively with the '612, '330, '922, and '856 Marks,

3

the "IMI Marks").[1]  *Id.* ¶ 13; *see id.* at 31–56.[2]  IMI has continuously used the IMI Marks in United States commerce since at least the 1990s.  *Id.* ¶ 14.

## II.    Eguia's Relationship with IMI

Eguia is a former Indian Motorcycle dealer.  *Id.* ¶ 21.  He is also the manager of IBW, a limited liability company organized under Minnesota law, which Eguia founded in 2022.  *Id.* ¶ 25; *id.* at 117–18.  Eguia "directs, controls, ratifies, participates in, and/or manages the activities of, and is the moving force behind, [IBW]."  *Id.* ¶ 25.

As part of his dealer arrangement with IMI, Eguia executed an agreement (the "Dealer Agreement") which authorized Eguia to use the IMI Marks "in connection with promotion, advertising, [and] selling" of Indian Motorcycles.  *See id.* ¶ 23; *id.* at 172, 174–75.  The Dealer Agreement also provided that Eguia was to "immediately cease all use" of the IMI Marks upon termination of the Dealer Agreement for any reason.  *Id.* ¶ 23.

Eguia sold his dealership in or before May 2018.  *See id.* ¶ 22.  After the sale was complete, IMI sent Eguia a letter formally terminating the Dealer Agreement on May 29, 2018.  *Id.* ¶ 22; *id.* at 170.  Accordingly, IMI asserts that as of the date of the termination letter, Eguia had "no right or license" to use the IMI Marks for any purpose.  *Id.* ¶ 23.

---

[1]    Two of the IMI Marks have pending applications for registration but are not registered as of the date of this Order: (1) INDIAN MOTORCYCLE, U.S. Trademark Application Serial No. 98/180,309 (filed Sept. 13, 2023); and (2) INDIAN MOTORCYCLE RALLY LLC, U.S. Trademark Application Serial No. 98/357,531 (filed Jan. 15, 2024).  *See* ECF No. 69 at 47, 52.

[2]    For clarity, when citing to exhibits attached to IMI's amended complaint (ECF No. 69), or any other document by its docket number, the Court cites the page numbers applied by CM/ECF rather than by exhibit number or any internal pagination, unless otherwise indicated.

### III.    Defendants' Allegedly Infringing Conduct

In or around 2016, while he was still an authorized Indian Motorcycle dealer, Eguia began organizing "Indian Bike Week" motorcycle rallies. *Id.* ¶ 24. After IMI terminated the Dealer Agreement, Eguia personally (and later through IBW) continued hosting "Indian Bike Week" rallies in multiple states, including Minnesota and Wisconsin. *Id.* ¶ 24.

Since IMI terminated the Dealer Agreement in May 2018, Defendants have advertised and promoted their "Indian Bike Week" rallies through a website[3] and a social media page, both of which Defendants "own, maintain, operate, and/or control." *Id.* ¶¶ 24–27. For example, on both the website and in a social media post promoting their 2024 "Indian Bike Week" rally, Defendants displayed the following photo:



*Id.* ¶ 30. Defendants charge attendees approximately $100 to register for their "Indian Bike Week" rallies, and registered attendees receive "exclusive" INDIAN MOTORCYCLE branded merchandise. *Id.* ¶¶ 31–32.

---

[3]    *See* Indian Bike Wk., https://www.indianbikeweek.com [https://perma.cc/ZRN8-6QWK] (last visited Aug. 27, 2025).

Defendants also "advertise, market, offer for sale, and sell . . . products bearing [the IMI] Marks." *Id.* ¶¶ 33–34; *id.* at 120–50. For example, Defendants "own[ed], maintain[ed], operate[d], and/or control[led]" an "Indian Bike Week" merchandise catalog on Shopify, where Defendants "advertised, marketed, offered for sale, and sold" products bearing one or more of the IMI Marks or substantially similar marks.[4] *Id.* ¶ 29. In addition, Eguia has "advertised and promoted unauthorized shirts bearing [the IMI] Marks" on a personal social media page and has "offered for sale and sold" such merchandise through eBay. *Id.* ¶ 33.

## IV. IMI Attempts To Stop Defendants' Infringing Conduct

IMI has attempted to halt Defendants' unauthorized use of the IMI Marks for years. *See id.* ¶ 43. On October 24, 2018—about five months after IMI terminated the Dealer Agreement with Eguia, *see id.* ¶ 22—IMI sent Eguia a letter informing him of IMI's exclusive right to use the IMI Marks and that his unauthorized uses of the IMI Marks constituted trademark infringement. *Id.* ¶ 43; *see id.* at 152–53. IMI demanded that Eguia "immediately cease [his] unauthorized and infringing uses" of the IMI Marks and requested "written confirmation that Eguia was no longer using any trademarks or logos owned by IMI." *Id.* ¶ 43. Eguia did not provide the written confirmation as requested, and his unauthorized use of the IMI Marks continued. *Id.* ¶ 44. In subsequent discussions between counsel for IMI and Eguia, "Eguia admitted to infringing the [IMI] Marks and admitted his

---

[4]    The "Indian Bike Week" Shopify page has been unavailable since January 16, 2025. ECF No. 69 ¶ 29.

use of [the IMI] Marks was likely to cause consumers to be confused." *Id.* ¶ 45. Nevertheless, "Eguia insisted that he was authorized to market, offer for sale, and sell products bearing [the IMI] Marks." *Id.*

After several months of unproductive discussions, IMI sent Eguia a second letter on June 18, 2019. *Id.* ¶ 46; *see id.* at 162–65. IMI reiterated that "Eguia's use of the name 'Indian Bike Week'" constitutes trademark infringement and that "such use is exceedingly and knowingly likely to create a likelihood of confusion among consumers." *Id.* ¶ 46. IMI again demanded that Eguia cease all use of the IMI Marks and "other confusingly similar marks and/or marks used in a manner as to suggest any affiliation with IMI," and requested written confirmation of Eguia's compliance with the demand. *Id.* Eguia again did not provide the requested confirmation and continued his unauthorized use of the IMI Marks. *Id.* ¶ 47. Eguia continued to insist that he "was authorized to sell merchandise bearing [the IMI] Marks" and continued to "advertise, market, offer for sale, and sell products bearing [the IMI] Marks." *Id.* ¶ 48.

IMI eventually resorted to other means to remove "infringing and confusing content" related to the IMI Marks from Eguia's website and other online platforms, including by submitting "takedown requests" to web hosting and domain providers. *Id.* ¶ 50. When those methods proved successful, Eguia agreed to participate in settlement discussions with IMI, and IMI and Eguia ultimately reached an agreement on September 17, 2020 (the "Settlement Agreement"). *Id.* ¶¶ 50–52; *id.* at 206–14.

Pursuant to the Settlement Agreement, IMI agreed to request restoration of Eguia's social media accounts and other online platforms that had been taken down and authorized

Eguia to "sell through approved existing inventory." *Id.* ¶ 53.  IMI further agreed to approve Eguia's use of "*one* design to promote Eguia's bike week," as depicted below:



*Id.*  In exchange, Eguia agreed, among other things, to "acknowledge[] IMI's prior rights in" the IMI Marks and "not to adopt, use or register" any trademarks "that are confusingly similar" to the IMI Marks.  *Id.* at 206–07.  Eguia also agreed: (1) "not to manufacture, have made, re-stock, replenish, or purchase any more designs infringing [the IMI] Marks or confusingly similar designs"; (2) "to place a statement of non-affiliation on all marketing materials, websites, and point of sale locations"; (3) "to remove [the IMI] Marks from [his] websites and social media accounts"; and (4) "to cease selling off existing inventory no later than September 1, 2022" and to confirm compliance with that requirement within five days of that date—that is, by September 6, 2022.  *Id.* ¶ 54.

## V.     Defendants' Infringing Conduct Continues

Eguia did not comply with his obligations under the Settlement Agreement.  Eguia personally—and later through IBW—continued to "manufacture, have made, re-stock,

replenish, and/or purchase more merchandise" bearing the IMI Marks and other "confusingly similar designs." *Id.* ¶ 55. Eguia also did not place the required "statement of non-affiliation" or remove the IMI Marks from marketing materials and the "Indian Bike Week" website and associated social media pages. *Id.* ¶¶ 56–58.

On December 23, 2021, IMI sent a letter to Eguia expressing IMI's concerns that Eguia had not honored his obligations under the Settlement Agreement. *Id.* ¶¶ 56–57; *id.* at 216–18. IMI requested written confirmation from Eguia by January 2, 2022, that he had added the statement of non-affiliation to, and removed the unapproved IMI Marks from, the "Indian Bike Week" website and associated social media pages. *Id.* ¶¶ 56–57. Eguia never provided the requested written confirmation.[5] *Id.* Eguia also has not complied with the Settlement Agreement's sell-off requirements. *See id.* ¶ 58.

IMI sent a final letter to Eguia on January 29, 2024, demanding that Eguia cease any further breaches of the Settlement Agreement and from "additional trademark infringement and unfair competition, including all use of [the IMI] Marks." *Id.* ¶ 64. Nonetheless, Defendants "are still using and . . . intend to continue using [the IMI] Marks in advertising, promoting, marketing, offering for sale, and selling goods and services related to their bike week." *Id.* ¶ 65.

---

[5]    The Court notes, however, that as of at least August 27, 2025, the "Indian Bike Week" website contains the following statement at the bottom of each page: "Indian Bike Week LLC[] and its products and services are not affiliated with or endorsed by Indian Motorcycle International, LLC."    Indian Bike Wk., https://www.indianbikeweek.com [https://perma.cc/ZRN8-6QWK] (last visited Aug. 27, 2025).

## VI.    IMI's Claims

IMI alleges that Eguia has "leveraged his former association with the INDIAN MOTORCYCLE brand to create a false impression of association between [the IMI] Marks and Defendants' products and services." *Id.* ¶ 26.  IMI further alleges that each use of the IMI Marks by Eguia or IBW since IMI terminated the Dealer Agreement has been without IMI's permission or consent. *Id.* ¶ 35.  And given that IBW was not organized until 2022, IMI asserts that IBW was never authorized to use the IMI Marks. *Id.*

IMI also alleges that the similarity between IMI's and Defendants' uses of the IMI Marks is "likely to cause confusion" because "[t]he marks are identical or nearly identical in overall appearance, sound, and meaning." *Id.* ¶ 36.  IMI asserts that Defendants "advertise, promote, and offer their products to consumers" in the same geographic markets and through the same channels of trade as IMI. *Id.* ¶¶ 38, 40.

IMI alleges that Eguia's conduct constitutes breach of the Settlement Agreement. *Id.* ¶ 65.  IMI also alleges that both Defendants' conduct constitutes infringement of the IMI Marks and that their continued unauthorized use of the IMI Marks "is likely to diminish the goodwill associated with" the IMI Marks. *Id.* ¶¶ 39, 41.  IMI contends that Defendants' conduct "has irreparably harmed, and continues to irreparably harm, IMI, and impairs the distinctive quality of and dilutes" the IMI Marks. *Id.* ¶ 66.

IMI brings a claim for breach of contract against Eguia relating to Eguia's alleged violations of the terms of the Settlement Agreement. *Id.* ¶¶ 67–82.  IMI also brings five additional claims against both Defendants: (1) trademark infringement under the Lanham Act, 15 U.S.C. § 1114, *id.* ¶¶ 83–89; (2) unfair competition under the Lanham Act, 15

10

U.S.C. § 1125(a), *id.* ¶¶ 90–98; (3) dilution by blurring under the Lanham Act, 15 U.S.C. § 1125(c), *id.*; (4) violations of the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. § 325D.44, *id.* ¶¶ 99–103; and (5) unfair competition under Minnesota common law, *id.* ¶¶ 104–06.  IMI requests an injunction permanently restraining Defendants from unauthorized use of the IMI Marks or any confusingly similar marks and disgorgement of Defendants' profits attributable to such unauthorized use.  *Id.* at 28–29.  IMI also requests that the Court order Defendants to destroy any inventory of merchandise bearing the IMI Marks or any confusingly similar marks.  ECF No. 80 at 29.

## PROCEDURAL BACKGROUND

IMI initiated this action on May 24, 2024.  ECF No. 1.  Defendants appeared through counsel, ECF No. 13, and filed an answer and counterclaim for breach of the Settlement Agreement on June 27, 2024, *see generally* ECF No. 16.[6]  Over the following months, Defendants actively participated in this litigation, including by responding to written discovery requests propounded by IMI.  *See generally* ECF Nos. 82-1, 82-4, 83.

On November 21, 2024, counsel for Defendants moved to withdraw without substitution, ECF No. 33, on the grounds that Defendants had not fulfilled their payment obligations with counsel and that counsel's continued, uncompensated representation would "result in an unreasonable financial burden," ECF No. 35 at 1.  On December 6, 2024, United States Magistrate Judge Tony N. Leung granted the motion to withdraw and

---

[6]    IMI answered Defendants' counterclaim on July 18, 2024.  *See generally* ECF No. 22.

11

ordered Defendants to appear with new counsel by January 17, 2025. ECF No. 41. Magistrate Judge Leung informed Eguia that if he did not appear with new counsel, the Court would conclude that he is proceeding pro se. *Id.* But Magistrate Judge Leung noted that IBW "may not appear without counsel" because it is a business entity. *Id.*; *see Razor Cap., LLC v. HP Debt Exch., LLC*, No. 13-cv-272 (MJD/JSM), 2015 WL 137617, at *2 (D. Minn. Jan. 7, 2015) ("[A] corporation may not proceed *pro se* or by a representative or agent of the corporation."). Magistrate Judge Leung explained that if IBW failed to obtain and appear with new counsel, IBW would be subject to "any and all appropriate remedies [and] sanctions," including "entry of whole or partial default judgment." ECF No. 41. Neither Defendant obtained new counsel by the Court's deadline, and as of the date of this Order, no attorney has appeared on behalf of either Defendant.

Defendants have not meaningfully participated in this litigation since their counsel withdrew. For instance, Defendants have not responded to interrogatories that IMI served on December 4, 2024, ECF No. 82 ¶¶ 13–16, and Eguia has not responded to requests for admission that IMI served on February 26, 2025, *id.* ¶ 17. Eguia appears to understand his discovery obligations, as he has corresponded with IMI by email to challenge various aspects of IMI's discovery requests. *See* ECF No. 82-7. Even so, Defendants have neglected or otherwise refused to respond to IMI's discovery requests despite IMI's repeated efforts to engage with Eguia and attempts to obtain responses. *See* ECF No. 82 ¶¶ 14, 21.

In addition, IMI moved for leave to file an amended complaint on January 30, 2025, ECF No. 46. In the related meet-and-confer statement, counsel for IMI stated that they

spoke with Eguia and that he opposed the motion, ECF No. 55, but Defendants did not file a response to IMI's motion, *see* ECF No. 58. The Court granted IMI's motion to amend its complaint, ECF No. 67, and IMI filed an amended complaint on March 10, 2025, ECF No. 69. Neither Defendant has answered IMI's amended complaint.

After the deadline for Defendants to respond to the amended complaint passed without either Defendant having filed an answer, IMI applied for entry of default by the Clerk of Court on March 31, 2025, ECF No. 73, which the Clerk granted on April 3, 2025, ECF No. 77. IMI then moved for entry of default judgment, ECF No. 78, arguing that default judgment is proper "in light of Defendants' failure to file a responsive pleading and IBW's failure to obtain counsel," ECF No. 80 at 11. Neither Defendant responded to the Clerk's entry of default or to IMI's motion for default judgment.

On July 2, 2025, the Court ordered Defendants to show cause by July 18, 2025, as to why the Court should not grant IMI's motion and enter default judgment against Defendants. ECF No. 95. Neither Defendant responded by the Court's deadline, but on July 21, 2025, Eguia sent an email to the Clerk of Court explaining that he had been unable to respond to the order to show cause because he had been dealing with a serious family emergency since July 9, 2025. *See* ECF No. 97. The Court entered a second order to show cause on July 21, 2025, explaining that Eguia's email was not responsive to the first show-cause order but nonetheless granting Defendants the opportunity to file a substantive response by July 25, 2025. ECF No. 98. Neither Defendant responded by the Court's deadline, but Eguia again sent an email to the Clerk of Court on July 31, 2025, again citing his family emergency as the reason he did not timely respond. *See* ECF No. 99. In addition

to the family emergency, Eguia also noted that he was busy planning for an unspecified event. *Id.* While largely nonresponsive to the Court's show-cause orders, Eguia asserted that it was IMI, not Eguia, that breached the Settlement Agreement, and that Defendants have not infringed the IMI Marks. *See id.* Eguia further represented that financial concerns have impeded his ability to secure counsel for himself and IBW but that he would be able to devote his attention to this lawsuit after August 18, 2025, and in any event by the end of October 2025. *See id.*

Because Defendants did not respond to IMI's motion for default judgment or offer a meaningful response to either of the Court's show-cause orders, and IBW remained without legal counsel, the Court took IMI's motion under advisement without a hearing on August 21, 2025. ECF No. 100. The Court has received no further communication from Eguia or IBW.

## ANALYSIS

"[D]efault judgments are not favored by the law and should be a rare judicial act" because "there is a judicial preference for adjudication on the merits." *Belcourt Pub. Sch. Dist. v. Davis*, 786 F.3d 653, 661 (8th Cir. 2015) (internal quotation marks omitted) (citations omitted). Nevertheless, federal courts may enter default judgment against a party who fails to file a responsive pleading to a complaint or to defend against a lawsuit. *See* Fed. R. Civ. P. 55.

Securing a default judgment is a two-step process. First, the party seeking default judgment must apply for entry of default from the Clerk of Court. *See* Fed. R. Civ. P. 55(a). "Only after an application is made, and granted under Rule 55(a), can a plaintiff seek a

14

Default Judgment" under Rule 55(b). *Armstrong v. Astrue*, 569 F. Supp. 2d 888, 895 n.6 (D. Minn. 2008). The decision whether to enter default judgment is within a district court's discretion. *See Ackra Direct Mktg. Corp. v. Fingerhut Corp.*, 86 F.3d 852, 856 (8th Cir. 1996).

## I.    Entry of Default

A defendant's "lack of participation in litigation" may serve as a basis for granting default judgment. *Idle Hands Enters., LLC v. No Coast Tattoo, LLC*, No. 22-cv-2186 (KMM/LIB), 2023 WL 5994702, at *2 (D. Minn. Sept. 15, 2023) (citing *Marshall v. Baggett*, 616 F.3d 849, 852 (8th Cir. 2010)). Default judgment is also appropriate when a party has engaged in "willful violations of court rules, contumacious conduct, or intentional delays," but it is not an appropriate sanction for "marginal failure to comply with time requirements." *Ackra Direct*, 86 F.3d at 856 (citation omitted).

IMI applied for entry of default after Defendants failed to timely answer IMI's amended complaint. ECF No. 73. The Clerk of Court subsequently granted the application and entered default against both Defendants. ECF No. 75. And as of the date of this Order, neither Defendant has filed an answer to IMI's amended complaint. *See Rogovsky Enter., Inc. v. Masterbrand Cabinets, Inc.*, 88 F. Supp. 3d 1034, 1039 (D. Minn. 2015) (citation omitted) ("[T]he Court must consider whether the allegedly defaulting party has filed a responsive Answer, or other pleading."). IMI's motion for default judgment is therefore procedurally proper. *See* Fed. R. Civ. P. 55(a)–(b); *Armstrong*, 569 F. Supp. 2d at 895 n.6. With the procedural requirements satisfied, the question is whether Defendants' conduct warrants entry of default. The Court has no difficulty determining that it does.

15

Beginning with IBW, the Court observes that IBW has been unrepresented by counsel since December 6, 2024, despite the Court's order that IBW obtain counsel and warning that IBW would face sanctions, including entry of default judgment, if counsel did not appear on its behalf by January 17, 2025. *See* ECF No. 41; *see also, e.g.*, *Ackra Direct*, 86 F.3d at 855, 857 (affirming default judgment against a business entity where its counsel withdrew and the entity "did not obtain substitute counsel and did not participate in any manner in the litigation" for nearly seven months); *Lewis v. Quickflight, Inc.*, No. 4:19-cv-357-SBJ, 2021 WL 6618705, at *4 (S.D. Iowa Apr. 12, 2021) (collecting cases holding that default judgment for failure to defend is appropriate where a business entity fails to secure counsel). In addition, IBW has not responded to IMI's amended complaint, has not complied with its discovery obligations since its counsel withdrew, and did not respond to either of the Court's orders to show cause. Accordingly, the Court finds that IBW is in default. *See Forsythe v. Hales*, 255 F.3d 487, 491 (8th Cir. 2001) (explaining that default judgment is appropriate where a party fails to participate in discovery or to show cause why default judgment should not be entered when ordered to do so); *United States v. Yennie*, 585 F. Supp. 3d 1194, 1198 (D. Minn. 2022) (internal quotation marks omitted) (citation omitted) ("A default judgment is not unfair when a defendant who has been properly served with a summons and complaint fails to respond or otherwise appear.").

The Court finds that Eguia is in default for largely the same reasons. Although Eguia is entitled to represent himself in this action, he also has not meaningfully participated in this litigation since his attorneys withdrew in December 2024. Like IBW, Eguia has not answered IMI's amended complaint or complied with his discovery

obligations, nor has he meaningfully responded to the Court's orders to show cause.  *See Forsythe*, 255 F.3d at 491; *Yennie*, 585 F. Supp. 3d at 1198.  And although the Court sympathizes with Eguia as it relates to the tragic family circumstances he describes in his responses to the Court's show-cause orders, Eguia himself acknowledges that those circumstances arose on July 9, 2025, *see* ECF No. 97—one week after the Court entered the first order to show cause, ECF No. 95, and several months after his answer to IMI's amended complaint and responses to IMI's discovery requests were due, *see* ECF No. 82 ¶¶ 13–17, 19.  Eguia utterly fails to explain—or even attempt to explain—why he shirked his obligations in this litigation in the eight months between his counsel's withdrawal in December 2024 and the entry of the first order to show cause in July 2025.  *See* ECF Nos. 97, 99.  "In general, *pro se* representation does not excuse a party from complying with a court's orders and with the Federal Rules of Civil Procedure."  *Ackra Direct*, 86 F.3d at 856.  And although Eguia states that he may be able to resume his participation in this litigation at some point before the end of October 2025, perhaps even through counsel, his dilatory conduct leaves the Court unable to trust his representations and unwilling to accept further delay.

Defendants have had ample opportunity to demonstrate that they intend to appropriately defend themselves and that they take seriously their obligations in this litigation.  They have instead chosen to adopt a dismissive (if not disrespectful) attitude toward those obligations, this litigation, and this Court.  Defendants' conduct extends beyond mere "marginal failure[s] to comply with time requirements" and ventures into "willful violations of court rules, contumacious conduct, or intentional delays," *id.* (citation

17

omitted), which the Court will neither tolerate nor excuse.  For these reasons, the Court finds Defendants in default.

## II.    Default Judgment

Upon a finding of default, the factual allegations in the complaint, except those relating to the amount of damages, are accepted as true and deemed to be admitted. *Murray*, 595 F.3d at 871; Fed. R. Civ. P. 8(b)(6).  Even if default judgment is otherwise warranted, however, a court must "ensure that the unchallenged facts constitute a legitimate cause of action prior to entering final judgment." *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 718 (8th Cir. 2019) (internal quotation marks omitted) (citation omitted).  "[M]ere conclusions of law and recitations of the elements of the causes of action do not constitute 'unchallenged facts.'" *Id.* (citation omitted).

IMI seeks entry of default judgment against Eguia for its breach-of-contract claim and against both Defendants for its Lanham Act, MDTPA, and Minnesota common law unfair competition claims, *see* ECF No. 80 at 12–24, and seeks injunctive relief and disgorgement of Defendants' profits, *see id.* at 25–33.  As set forth below, the Court finds that the "unchallenged facts" in IMI's amended complaint constitute "legitimate cause[s] of action." *Glick*, 944 F.3d at 718.

### A.    Breach of Contract as to Eguia (Count I)

To establish a valid claim for breach of contract under Minnesota law,[7] IMI must show: (1) formation of a contract with Eguia; (2) performance by IMI of any conditions precedent to its right to demand performance by Eguia; and (3) breach of the contract by Eguia. *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011). Accepting the factual allegations in the amended complaint as true, *Murray*, 595 F.3d at 871, IMI has stated a legitimate claim for breach of the Settlement Agreement by Eguia.

First, IMI and Eguia formed a valid contract when they entered the Settlement Agreement on September 17, 2020. ECF No. 69 at 206–14; *see Lansing v. Wells Fargo Bank, N.A.*, 894 F.3d 967, 972 (8th Cir. 2018) (quoting *Mr. Steak, Inc. v. Sandquist Steaks, Inc.*, 245 N.W.2d 837, 838 (Minn. 1976)) ("A settlement agreement is contractual in nature and 'can be enforced by an ordinary action for breach of contract.'"). Indeed, Eguia acknowledged and asserted the validity of the Settlement Agreement by bringing a counterclaim against IMI for breach of the Settlement Agreement. *See* ECF No. 16 at 13 (alleging that IMI and Eguia "entered into a contract on September 17, 2020").

Second, there are no unfulfilled conditions precedent to IMI's right to demand performance by Eguia. *See Patrick's Rest., LLC v. Singh*, No. 18-cv-764 (ECT/KMM), 2019 WL 2869082, at *12 (D. Minn. July 3, 2019) (quoting *Minnwest Bank Cent. v. Flagship Props., LLC*, 689 N.W.2d 295, 299 (Minn. Ct. App. 2004)) ("Under Minnesota

---

[7]    The Settlement Agreement contains a choice-of-law provision which states that it "shall be governed by, construed and enforced according to the laws of the State of Minnesota." ECF No. 69 at 210.

law, '[a] condition precedent is an event,' including the other party's performance, 'that must occur before a party is required to perform a certain contractual duty.'" (alteration in original)).  In other words, Eguia was bound by the terms of the Settlement Agreement as of the date it was fully executed.

Finally, the allegations in IMI's amended complaint show that Eguia breached the Settlement Agreement in numerous ways.  Eguia was required to cease manufacturing products bearing the IMI Marks or similar designs; to place a statement of non-affiliation on all marketing materials and his website and social media pages; to remove the IMI Marks from his website; and to cease selling existing inventory by September 1, 2022, and to confirm compliance with that obligation by September 6, 2022.  ECF No. 69 ¶ 54; *see also id.* at 206–08.  IMI alleges that Eguia did not comply with any of those requirements. *See id.* ¶¶ 55–58.

The unchallenged facts in IMI's amended complaint constitute a legitimate claim for breach of contract against Eguia.  Accordingly, the Court grants default judgment as to IMI's breach-of-contract claim.

### B.    Lanham Act Claims (Counts II & III)

IMI brings claims under the Lanham Act for trademark infringement (Count II) and unfair competition and dilution (Count III).  ECF No. 69 ¶¶ 83–98.  Because claims for trademark infringement and unfair competition under the Lanham Act require "overlapping proof," *Idle Hands*, 2023 WL 5994702, at *2, the Court analyzes those claims together before turning to IMI's dilution claim.

20

### i.  Trademark Infringement and Unfair Competition

"The principle underlying trademark protection is that distinctive marks—words, names, symbols, and the like—can help distinguish a particular artisan's goods from those of others." *Matal v. Tam*, 582 U.S. 218, 223 (2017) (citation omitted). To that end, the Lanham Act provides that a registered trademark owner may bring suit in federal court against any person or entity who, without the owner's consent, uses a mark that "too closely resembles" the owner's mark. *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 144 (2015); *see also* 15 U.S.C. § 1114(1)(a). The Lanham Act also empowers a registered trademark owner to "recover for unfair competition that results from false designations of origin." *Polaris Indus. Inc. v. TBL Int'l Inc.*, No. 19-cv-291 (WMW/DTS), 2020 WL 1075019, at *2 (D. Minn. Mar. 6, 2020); *see also* 15 U.S.C. § 1125(a)(1).

To establish trademark infringement and unfair competition under the Lanham Act, IMI must show: (1) it has valid, protectable trademarks; and (2) there is a likelihood of confusion between its marks and the marks that Defendants are using. *Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 322 (8th Cir. 2018); *see Polaris Indus.*, 2020 WL 1075019, at *2 (citing *Co-Rect Prods., Inc. v. Marvy! Advert. Photography, Inc.*, 780 F.2d 1324, 1329 (8th Cir. 1985)) (explaining that the factors used to determine likelihood of confusion for trademark infringement under the Lanham Act are also used to determine likelihood of confusion for unfair competition under the Lanham Act). Ultimately, "[t]he court must decide whether the defendant[s'] use of a mark in commerce 'is likely to cause confusion, or to cause mistake, or to deceive' with regards to

21

the plaintiff's mark." *B & B Hardware*, 575 U.S. at 144 (quoting 15 U.S.C. §§ 1114(1)(a),

1125(a)(1)(A)).

Courts in the Eighth Circuit consider six "nonexclusive, nonexhaustive" factors to

assess likelihood of confusion:

> (1) the strength of the owner's mark; (2) the similarity of the owner's mark
> and the alleged infringer's mark; (3) the degree to which the products
> compete with each other; (4) the alleged infringer's intent to pass off its
> goods as those of the trademark owner; (5) incidents of actual confusion; and
> (6) the type of product, its cost and conditions of purchase.

*H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 947 (8th Cir. 2023) (internal quotation marks

omitted) (citation omitted).  No single factor controls the inquiry, *id.*, and "depending on

the context, a strong showing as to one factor may serve to make a different factor more or

less important," *Select Comfort Corp. v. Baxter*, 996 F.3d 925, 933 (8th Cir. 2021).

Nonetheless, "each must be analyzed."  *A.I.G. Agency, Inc. v. Am. Int'l Grp., Inc.*, 33 F.4th

1031, 1035 (8th Cir. 2022) (citation omitted).

IMI easily meets the first element, as nearly all of the IMI Marks are registered and

thus presumptively valid.  ECF No. 69 at 58–115; *see U.S. Pat. & Trademark Off. v.

Booking.com B. V.*, 591 U.S. 549, 552 (2020) (internal quotation marks omitted) (citation

omitted) ("The owner of a mark on the principal register enjoys valuable benefits, including

a presumption that the mark is valid.").

That leaves the second element:  whether there is a likelihood of confusion between

the IMI Marks and the marks used by Defendants.  Applying the likelihood-of-confusion

factors to the unchallenged facts in IMI's amended complaint, the Court concludes that a

likelihood of confusion exists.

1.    <u>Strength of the IMI Marks</u>

The IMI Marks are strong.  IMI has continuously used the IMI Marks in commerce "since at least the 1990s."  ECF No. 69 ¶ 14.  In addition, because they are registered, the IMI Marks "are presumed to be distinctive," *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir. 1994), and a "strong and distinctive trademark is entitled to greater protection than a weak or commonplace one," *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).   Further, the '612, '330, '922, and '856 Marks, at least, have each been registered for more than five years, *see* ECF No. 69 at 63, 72, 75–76, which makes IMI's exclusive right to use those marks "incontestable," 15 U.S.C. § 1065.  Therefore, this factor weighs heavily in IMI's favor.

2.    <u>Similarity of the Parties' Marks</u>

The IMI Marks and the marks used by Defendants are remarkably similar, if not identical, in overall appearance, sound, and meaning.  *Compare* ECF No. 69 ¶¶ 9–12 (discussing the registrations of '612, '330, '922, and '856 Marks), *with id.* ¶¶ 30, 32–33, 36 (showing Defendants' use of nearly identical marks in commerce).   Any minor differences in the way Defendants use their near-identical marks are insufficient to find the parties' respective marks dissimilar, especially given that the parties use their respective marks on closely related products.  *See SquirtCo*, 628 F.2d at 1091 ("Where the products are closely related, less similarity in the trademarks is necessary to support a finding of infringement.").  This factor also weighs heavily in IMI's favor.

3.    Degree to Which the Parties' Products Compete

The parties offer the same or substantially similar goods and services in connection with their respective marks.  The IMI Marks are registered for use in connection with, among other things: motorcycles, motorcycle parts, clothing, cloth patches, backpacks, bags, and posters.  *See* ECF No. 69 ¶¶ 9–12; *id.* at 31–36.  Defendants, without authorization, have used the IMI Marks or nearly identical marks in connection with their "Indian Bike Week" motorcycle rallies and related goods, including gas caps, clothing, patches, and stickers.  *Id.* ¶¶ 28–35, 37.  Further, the parties promote and advertise their respective goods and services in the same geographic regions and through the same channels of trade.  *Id.* ¶¶ 38–40.  As such, "it is reasonable for consumers to think that the products come from the same source, and confusion, therefore, is more likely."  *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1056 (8th Cir. 2005); *see also Roederer v. J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 868–69 (D. Minn. 2010) (collecting cases holding that a defendant's use of an allegedly infringing mark through the same channels of trade and in the same geographic regions as the plaintiff uses its mark weighs in favor of likelihood of confusion).  This factor therefore weighs heavily in IMI's favor.

4.    Defendants' Intent To Pass Off Their Goods as IMI's

Defendants plainly intended to pass off their goods and services as associated with IMI and IMI's INDIAN MOTORCYLE brand.  Indeed, Eguia launched his "Indian Bike Week" rallies while he was an authorized Indian Motorcycle dealer and continued hosting such rallies, both individually and later through IBW, under the same name after IMI terminated the Dealer Agreement.  ECF No. 69 ¶ 24.  Further, in the discussions that

followed IMI's first letter to Eguia in October 2018, "Eguia admitted to infringing the [IMI] Marks and admitted his use of [the IMI] Marks was likely to cause consumers to be confused." *Id.* ¶ 45. And despite Eguia acknowledging IMI's prior rights in the IMI Marks and agreeing not to use them or any similar marks in the Settlement Agreement, *id.* at 206–07, Defendants continued using the IMI Marks and near-identical marks in connection with their goods and services, *id.* ¶ 65. Eguia's admission and Defendants' conduct after Eguia's acknowledgement of IMI's prior rights "is relevant because it demonstrates [Defendants'] true opinion as to the dispositive issue of whether confusion is likely." *Am. Dairy Queen Corp. v. W.B. Mason Co.*, 543 F. Supp. 3d 695, 716 (D. Minn. 2021) (citation omitted). This factor also weighs heavily in IMI's favor.

### 5.    Incidents of Actual Confusion

IMI does not allege any incidents of actual consumer confusion. But although "such incidents are proof of the likelihood of confusion, the plaintiff is not required to bring forth incidents of actual confusion to succeed in an infringement case." *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 768 (8th Cir. 2010); *see also Warner Bros. Ent., Inc. v. X One X Prods.*, 840 F.3d 971, 981 (8th Cir. 2016) (quoting *SquirtCo*, 628 F.2d at 1091) ("'[A]ctual confusion is not essential to a finding of trademark infringement,' but it is a kind of proof a court may consider."). Regardless, absent any evidence of actual confusion, the Court finds this factor weighs in Defendants' favor.

### 6.    Types of Products and Conditions of Purchase

IMI does not offer any allegations specifically relating to "the ordinary purchaser" of the parties' respective goods, "the normally prevalent conditions of the market," or "the

attention such purchasers usually give in buying that class of goods." *H&R Block*, 58 F.4th at 949 (citation omitted). However, given Eguia's admission that his use of the IMI Marks "was likely to cause consumers to be confused," ECF No. 69 ¶ 45, the Court infers that "the purchasing conditions are not so different that they dispel the risk of confusion" and that "even careful consumers could be confused" as to whether Defendants are affiliated with IMI, "particularly in the context of" their closely related goods and services, *H&R Block*, 58 F.4th at 949. As such, the Court finds this factor to be neutral, at minimum.

### 7.    Conclusion on Infringement and Unfair Competition

In sum, the Court finds that four of the six likelihood-of-confusion factors weigh heavily in IMI's favor, one factor weighs in Defendants' favor, and one factor is neutral. On balance, the uncontested facts are sufficient to establish a likelihood of confusion between the IMI Marks and Defendants' marks, as to the sources of IMI's and Defendants' respective goods and services, and as to an affiliation or association between IMI and Defendants. Accordingly, the Court grants default judgment as to IMI's trademark infringement and unfair competition claims under the Lanham Act.

### ii.    Dilution

"'[D]ilution by blurring' is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). Under the Lanham Act, the owner of a famous trademark may bring an action against any person or entity that "uses the owner's mark or trade name in commerce, after the mark has become famous, in a way 'that is likely to cause dilution by blurring . . . of the famous mark, regardless of the presence or absence of actual or likely

confusion, of competition, or of actual economic injury.'" *Am. Dairy Queen*, 543 F. Supp. 3d at 708 (quoting 15 U.S.C. § 1125(c)(1)).  To establish a claim for dilution under the Lanham Act, IMI must show: (1) its marks are famous; (2) its marks are distinctive; (3) Defendants use IMI's famous marks in commerce; (4) Defendants' use occurred after IMI's marks became famous; and (5) Defendants' use caused "dilution of the distinctive quality" of IMI's marks. *Northland Ins. Cos. v. Blaylock*, 115 F. Supp. 2d 1108, 1122 (D. Minn. 2000).

   "'[F]amous' is a rigorous standard." *Everest Cap. Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 763 (8th Cir. 2005).  In assessing whether a mark is sufficiently famous for purposes of a dilution claim under the Lanham Act, courts "may consider all relevant factors," including: (1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the amount, volume, and geographic extent of sales of goods or services in connection with the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark is registered. *Am. Dairy Queen*, 543 F. Supp. 3d at 708–09 (quoting 15 U.S.C. § 1125(c)(2)(A)(i)–(iv)).  To determine whether blurring has occurred, courts consider "all relevant factors," including: (1) the degree of similarity between the parties' marks; (2) the distinctiveness of the famous mark; (3) the exclusivity of the famous mark; (4) how recognizable the famous mark is; (5) the intent of the user of the allegedly diluting mark; and (6) the existence of actual association between the famous mark and the allegedly diluting mark. *Id.* at 709 (quoting 15 U.S.C. § 1125(c)(2)(B).

Upon consideration of the various factors in light of the unchallenged facts in IMI's amended complaint, the Court finds that IMI has established a valid claim for dilution by blurring under the Lanham Act.

First, IMI has established that the IMI Marks are famous and distinctive. IMI launched its INDIAN MOTORCYCLE brand in 1901, and it is "now America's oldest motorcycle brand." ECF No. 69 ¶ 16. Further, IMI has continuously used the IMI Marks in commerce "since at least the 1990s," *id.* ¶ 14, and has "provided its unique, high-quality products and services under [the IMI] Marks to consumers in the United States for generations, using an extensive dealer network and widespread marketing campaigns," *id.* ¶ 16. As a result of IMI's efforts, the IMI Marks are "well known . . . throughout the world." *Id.* ¶ 15. Finally, nearly all of the IMI Marks are federally registered, *see, e.g.*, *id.* ¶¶ 9–13, and registered marks "are presumed to be distinctive," *Aromatique*, 28 F.3d at 869.

IMI's allegations further show that Defendants have used the IMI Marks and other near-identical marks in commerce. *See* ECF No. 69 ¶¶ 28–35, 37. Eguia's use of the IMI Marks began in direct connection and association with IMI by virtue of the Dealer Agreement between IMI and Eguia, *see id.* ¶¶ 21–24, but continued well after IMI terminated that agreement, *see id.* ¶¶ 24, 35. And IBW was never authorized to use the IMI Marks. *Id.* ¶ 35. Defendants' unauthorized use of the IMI Marks beginning in 2018, *see id.* ¶¶ 22–24, came after the IMI Marks had become famous, *see id.* ¶¶ 15–20. Further, although it appears that Defendants, at some point, added a statement disclaiming any affiliation with or endorsement by IMI to their "Indian Bike Week" website, *supra* at 9 n.5,

it is unchallenged that no such disclaimer was present on that website as of March 10, 2025, the date IMI filed its amended complaint, *see* ECF No. 69 ¶ 56.

Finally, given Eguia's acknowledgement in the Settlement Agreement of IMI's rights in the IMI Marks, Defendants' conduct evinces an intention to cause, and to profit from, confusion based on a false suggestion of association between Defendants and their goods and services, on the one hand, and IMI and its goods and services, on the other hand. *See id.* ¶ 45 ("Eguia admitted to infringing the [IMI] Marks and admitted his use of [the IMI] Marks was likely to cause consumers to be confused.").

Taken together, the Court finds that the uncontested facts establish a legitimate claim for dilution by blurring under the Lanham Act. Therefore, the Court grants default judgment as to IMI's dilution claim.

### C.    State Law Claims (Counts IV & V)

IMI also brings claims for violations of the MDTPA and unfair competition under Minnesota common law. *Id.* ¶¶ 99–106. Claims for deceptive trade practices under the MDTPA and for unfair competition under Minnesota common law are "coextensive" with claims for trademark infringement and unfair competition under the Lanham Act and are analyzed using the same standards. *Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 645 F. Supp. 2d 734, 756 (D. Minn. 2009) (quoting *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 935 n.3 (8th Cir. 2003)); *see SYT Sols., LLC v. Burger*, No. 20-cv-794 (JRT/KMM), 2021 WL 101123, at *7 (D. Minn. Jan. 12, 2021) ("Despite their distinct origins, the elements for proving trademark infringement claims under the common law, the MDTPA, and the Lanham Act mirror each other, and Courts analyze them coextensively."); *Polaris Indus.*,

2020 WL 1075019, at *3 ("[T]hat which constitutes unfair competition under the Lanham Act also constitutes common law unfair competition.").

Because IMI has established legitimate claims for trademark infringement and unfair competition under the Lanham Act, the Court finds that IMI also has established legitimate claims for violations of the MDTPA and unfair competition under Minnesota common law. *See Polaris Indus.*, 2020 WL 1075019, at *2–3. Accordingly, the Court grants IMI's motion for default judgment as to its MDTPA and common law unfair competition claims.

## III.    Relief

IMI requests both injunctive relief and disgorgement of Defendants' profits. *See* ECF No. 69 at 28–29; ECF No. 80 at 25–31. Because IMI's amended complaint sets forth legitimate causes of action, and because the Lanham Act authorizes courts to grant injunctive relief and disgorgement of profits for the purpose of deterring trademark infringement, unfair competition, and dilution, the Court finds that the relief IMI requests is warranted, appropriate, and necessary to deter Defendants' unlawful conduct.

### A.    Injunctive Relief

IMI requests a permanent injunction prohibiting Defendants from engaging in any further use of the IMI Marks or any confusingly similar marks. ECF No. 69 at 28–29. IMI further requests an injunction requiring Defendants to: (1) "destroy all apparel, merchandise, and other goods"; (2) "destroy or remove all advertisements or promotional materials (including on websites and social media pages) that use the [IMI] Marks, the name 'Indian Bike Week,' and any marks confusingly similar to" the IMI Marks; and

(3) certify in writing and under oath that such destruction or removal has been completed. ECF No. 80 at 29.

The Lanham Act authorizes courts to grant injunctions "according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a). Injunctive relief is also available under the MDTPA. Minn. Stat. § 325D.45, subd. 1. Further, when trademark infringement or unfair competition under the Lanham Act has been shown, "the court may order that the subject of the violation shall be delivered up and destroyed." *Polaris Indus.*, 2020 WL 1075019, at *4 (citation modified) (quoting 15 U.S.C. § 1118).

To show entitlement to such injunctive relief, IMI must show: "(1) its actual success on the merits; (2) that it faces irreparable harm; (3) that the harm to it outweighs any possible harm to others; and (4) that an injunction serves the public interest." *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1012 (8th Cir. 2011). IMI has met its burden.

First, IMI has established its success on the merits "because the facts in the [First Amended] Complaint are sufficient to establish liability[,] and they are deemed to be true in this motion for default judgment." *Hydreon Corp. v. JC Bros.*, No. 15-cv-1917 (SRN/JSM), 2016 WL 6826158, at *9 (D. Minn. Nov. 18, 2016).

Second, IMI faces irreparable harm from Defendants' use of the IMI Marks "because in trademark law, injury is presumed once a likelihood of confusion has been established." *Cmty. of Christ*, 634 F.3d at 1012. In addition, Eguia acknowledged that IMI

31

would suffer "irreparable harm" if he was found to have breached the Settlement Agreement.  ECF No. 69 at 211.

Third, because Defendants did not respond to IMI's motion for default judgment, it is not possible for the Court to determine whether the balance between IMI's irreparable harm and any harm the requested injunction would cause Defendants weighs in Defendants' favor.  But as one court in this District aptly put it: "Defendants aren't here to describe the harm they face.  If they were, a finding that Defendants are harmed to that degree would require looking away from their plainly infringing activities.  That would seem inappropriate." *Allied Med. Training, LLC v. Knowledge2SaveLives L.L.C.*, No. 19-cv-3067 (ECT/KMM), 2020 WL 3533469, at *2 (D. Minn. June 30, 2020).

Finally, trademark infringement is "inherently contrary to the public interest." *Magnum Rsch., Inc. v. Ho Feng Indus. Co.*, No. 03-cv-6438 (JNE/JSM), 2005 WL 8164468, at *4 (D. Minn. Aug. 20, 2005); *see Anheuser-Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 776 (8th Cir. 1994) (noting "the public interest in avoiding consumer confusion").  To the extent that "the public had an interest in this lawsuit, it would appear to be less significant but favor [IMI] for the simple reason that the public disfavors activities that are so obviously infringing." *Allied Med. Training*, 2020 WL 3533469, at *2.

Because each factor weighs in IMI's favor, the Court grants IMI's request for a permanent injunction as set forth in the Order below.

## B.    Disgorgement

IMI also requests disgorgement of Defendants' profits in the amount of $120,000. *See* ECF No. 69 at 29; ECF No. 80 at 30–31.

A party seeking an award of damages in connection with a default judgment must "prove its actual damages to a reasonable degree of certainty." *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 818–19 (8th Cir. 2001). A district court may ascertain damages "by comput[ing] from facts of record . . . the amount which the plaintiff is lawfully entitled to recover." *Pope v. United States*, 323 U.S. 1, 12 (1944). "Once the amount of damages has been established, the court may enter judgment." *Stephenson v. El-Batrawi*, 524 F.3d 907, 916 (8th Cir. 2008).

Generally, "relief in a Lanham Act case should be limited to an injunction if that is sufficient to do equity." *Martinizing Int'l, LLC v. BC Cleaners, LLC*, 855 F.3d 847, 852 (8th Cir. 2017) (citation omitted); *see Safeway Transit LLC v. Discount Party Bus*, 954 F.3d 1171, 1178 (8th Cir. 2020) (citation omitted) ("[A]n injunction is the preferred Lanham Act remedy."). But the Lanham Act also "contemplates that a disgorgement or accounting of profits may be appropriate to remedy unfair infringement." *Masters v. UHS of Del., Inc.*, 631 F.3d 464, 471 (8th Cir. 2011); *see* 15 U.S.C. § 1117(a) (empowering trademark owners who have demonstrated certain violations of the Lanham Act "to recover . . . defendant's profits").

Disgorgement of profits may be based on unjust enrichment, as a measure of plaintiff's damages, or as deterrence for willful behavior. *Masters*, 631 F.3d at 474. "Although a showing of willfulness is not a precondition for the disgorgement of profits based on a trademark infringement claim, it is a precondition for a profits award based on a trademark dilution claim." *Taco John's Int'l, Inc. v. Taco Chon Mexican Grill LLC*, No. 22-cv-1050 (JRT/LIB), 2023 WL 5756847, at *12 (D. Minn. Sept. 6, 2023) (citing

33

*Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 218–19 (2020)).  The plaintiff need not prove actual damages, *Masters*, 631 F.3d at 474, or actual consumer confusion, *Safeway Transit*, 954 F.3d at 1181.  But "courts should consider not only whether an enhanced profits award is appropriate, but also whether the disgorgement of *all* profits attributable to the infringing product is necessary to achieve the desired deterrent effect."  *Id.* (citation omitted).

Although a finding of willfulness is arguably unnecessary here given the finding of infringement, *see Taco John's*, 2023 WL 5756847, at *12, the Court would be remiss if it did not note the willful and deliberate nature of Defendants' infringing conduct.  Eguia— and by extension, IBW—was on notice by no later than October 2018 that their conduct infringed IMI's rights in the IMI Marks.  *See* ECF No. 69 ¶ 43.  IMI attempted to resolve this dispute in good faith and without resorting to litigation for several years, including by entering the Settlement Agreement in 2020 with Eguia.  *See id.* ¶ 52.  But despite IMI's remarkable patience and restraint, and despite Eguia's agreement to cease the conduct he himself admitted constituted infringement, Defendants have continued to violate IMI's trademark rights.  *See id.* ¶¶ 45, 48, 52–65.  Indeed, in his untimely, excuse-laden response to the Court's second order to show cause, Eguia persists in his belief that he and IBW are lawfully using marks that are nearly identical to the IMI Marks.[8]  *See* ECF No. 99.  Given

---

[8]    In fact, the Court observes that since at least August 27, 2025, with this case still ongoing, Defendants' have been promoting their 2026 "Indian Bike Week" rally on their website.  The website touts the tenth anniversary rally and a Guinness record attempt for the longest parade of Indian motorcycles.  *See* Indian Bike Wk.,

that Eguia has shown no intention of honoring his obligations under the Settlement Agreement, which mirror the terms of the injunction IMI requests here, the Court is convinced that injunctive relief alone is not sufficient to "achieve the desired deterrent effect." *See Safeway Transit*, 954 F.3d at 1181 (citation omitted).

The question, then, is whether the $120,000 award IMI requests is appropriate. Through requests for admission, IMI asked Eguia to admit that there were more than 600 registrants for each of Defendants' 2023 and 2024 "Indian Bike Week" rallies—that is, at least 1,200 total registrants over those two years—and that those registrants were each required to pay a $100 registration fee to IBW. ECF No. 82-12 at 4. Eguia did not respond to those requests, ECF No. 82 ¶ 17, so they are deemed to be admitted, Fed. R. Civ. P. 36(a)(3). Therefore, the Court infers that Defendants received, at minimum, $120,000 in revenue through registrations for Defendants' 2023 and 2024 "Indian Bike Week" rallies. Although "profit" and "revenue" are not typically or colloquially considered to be the same thing, the Lanham Act "presumes that the infringing defendant's sales (that is, revenue) and profits *are* the same thing, until the defendant proves otherwise." *Dyson Tech. Ltd. v. David 7 Store*, 132 F.4th 526, 529 (7th Cir. 2025) (citing 15 U.S.C. § 1117(a)). Defendants did not respond to IMI's discovery requests or its motion for default judgment and thus have not shown any expenses that "should be deducted from the gross revenue." *Safeway Transit*, 954 F.3d at 1180 (citation omitted). And in any event, $120,000 is almost certainly

---

https://www.indianbikeweek.com [https://perma.cc/ZRN8-6QWK] (last visited Aug. 27, 2025).

a conservative estimate of the ill-gotten gains attributable to Defendants' infringing conduct since it only accounts for the registration revenue from their 2023 and 2024 "Indian Bike Week" rallies. It does not account for registration revenue or profit from Defendants' rallies in earlier years or the 2025 rally Defendants hosted August 8 through August 18, 2025. It also does not account for any revenue or profit generated by Defendants' sales of infringing goods.[9] *See* ECF No. 80 at 30–31.

Accordingly, the Court finds IMI's request for disgorgement of Defendant's profits in the amount of $120,000 is supported by the unchallenged facts and Eguia's admissions, appropriate given the circumstances of this case, and necessary to deter Defendants from engaging in further unlawful and unauthorized use of the IMI Marks.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings in this matter,

**IT IS HEREBY ORDERED** that:

1.    IMI's Motion for Default Judgment (ECF No. 78) is **GRANTED**;

---

[9]    IMI also argues that it is entitled to an award of $240,000 to recover its reasonable attorneys' fees under both the Lanham Act and the terms of the Settlement Agreement. ECF No. 80 at 31–33; *see* 15 U.S.C. § 1117(a) (authorizing awards of attorneys' fees); ECF No. 69 at 211 (authorizing IMI to seek attorneys' fees if Eguia breached the Settlement Agreement). Under the Lanham Act, an award of attorney fees is appropriate in "exceptional cases" where, as here, "a defendant's unlawful conduct was willful and deliberate." *Cmty. of Christ*, 634 F.3d at 1013 (internal quotation marks omitted) (citation omitted). Nonetheless, IMI "recognizes that Eguia is an individual and, in an effort to streamline the issues and not cause Eguia undue hardship, IMI is not seeking its reasonable attorneys' fees and costs." ECF No. 80 at 32–33. Therefore, the Court need not analyze the propriety or enter an award of attorneys' fees to IMI.

2.      Defendants—both Arturo Eguia and Indian Bike Week LLC—and all others acting under or through Defendants, or in active concert or participation with Defendants, are **PERMANENTLY ENJOINED** from:

   a.     Engaging in any use of the IMI Marks, as identified in the First Amended Complaint (ECF No. 69 ¶¶ 9–12) and Exhibit 1 attached thereto (ECF No. 69 at 31–56), and any marks confusingly similar to the IMI Marks (including, without limitation, the marks depicted or otherwise identified in paragraphs 30–34 of the First Amended Complaint), in connection with Defendants' motorcycle rallies, apparel, merchandise, and related goods and services, including, but not limited to:

   i.     In any social media handle or web domain name;

   ii.    On any social media pages, including, but not limited to, Eguia's personal social media pages and IBW's social media pages;

   iii.   On Defendants' websites, including the website at https://www.indianbikeweek.com; and

   iv.    On any advertising or promotional materials or merchandise;

   b.     Engaging in any conduct causing consumers to believe that Defendants' products or services are those sold or offered under the authorization, control, or supervision of IMI, or are sponsored by, approved by, or otherwise connected or affiliated with IMI; and

c.    Manufacturing, shipping, delivering, holding for sale, transferring, or otherwise moving, storing, or distributing, in any manner, products or inventory not manufactured by or for IMI, not authorized by IMI to be sold or offered for sale, and which bear any of the IMI Marks and any confusingly similar marks;

3.    Within 30 days of the date of this Order, Defendants and all others acting under or through Defendants, or in active concert or participation with Defendants, must **DESTROY** all apparel, merchandise, and other goods, and **DESTROY** or **REMOVE** all advertisements or promotional materials (including on websites and social media pages), that use:

i.    the IMI Marks, as identified in the First Amended Complaint (ECF No. 69 ¶¶ 9–12) and Exhibit 1 attached thereto (ECF No. 69 at 31–56);

ii.    any marks confusingly similar to the IMI Marks (including, without limitation, the marks depicted or otherwise identified in paragraphs 30–34 of the First Amended Complaint); and

iii.    the name "Indian Bike Week";

4.    Within 45 days of the date of this Order, Defendants shall submit to this Court and to IMI an affidavit, in writing and under penalty of perjury and any appropriate sanctions, setting forth in detail the manner and form by which Defendants have complied with the permanent injunction described in paragraphs 2–3 above; and

38

5.      IMI is awarded $120,000 attributable to Defendants' infringing and unlawful use of the IMI Marks, for which Defendants are jointly and severally liable.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September 5, 2025                           *s/Laura M. Provinzino*
                                                  Laura M. Provinzino
                                                  United States District Judge