**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

---

INDIAN MOTORCYCLE
INTERNATIONAL, LLC,

          Plaintiff,

v.

ARTURO EGUIA and INDIAN BIKE
WEEK LLC,

          Defendants.

Case No. 24-cv-1958 (LMP/SGE)

**ORDER DENYING DEFENDANTS'
MOTION TO VACATE
DEFAULT JUDGMENT**

---

Paige S. Stradley and Michael A. Erbele, **Merchant & Gould P.C., Minneapolis, MN**; and Alana LeFebvre, **Merchant & Gould P.C., Denver, CO**, for Plaintiff.

Terrance C. Newby and Dany Berbari, **Maslon LLP, Minneapolis, MN**, for Defendants.

Plaintiff Indian Motorcycle International, LLC ("IMI") brought this action against Defendants Arturo Eguia and Indian Bike Week, LLC ("IBW"), asserting claims of breach of contract; trademark infringement and unfair competition under the Lanham Act; and deceptive trade practices and unfair competition under Minnesota state law. ECF No. 1 ¶¶ 67–106. Defendants actively participated in the litigation initially, but after their counsel withdrew, they did not secure replacement counsel and ceased meaningfully participating and appropriately defending themselves in this case. ECF No. 101 at 11–14. With the Court's leave, IMI filed an amended complaint, ECF No. 69, but Defendants did not file an answer, ECF No. 101 at 12–13. IMI then moved for entry of default judgment, ECF No. 78, but Defendants failed to substantively respond to IMI's motion despite being

afforded multiple opportunities to do so, ECF No. 101 at 13–14.  The Court took IMI's

motion for default judgment under advisement and, on September 5, 2025, granted the

motion and directed that judgment be entered against Defendants on all of IMI's claims.

*Id.* at 19–39.  Notably, the Court granted IMI's request for a permanent injunction and

ordered Defendants to file an affidavit certifying their compliance with the injunction by

October 20, 2025.  *Id.* at 36–39.

On October 17, 2025, new counsel appeared on Defendants' behalf.  ECF No. 105.

On October 20, 2025, Defendants filed a declaration certifying their partial compliance

with the permanent injunction, ECF No. 111, and a motion to vacate the default judgment

under Federal Rule of Civil Procedure 60(b)(1), ECF No. 106.  Upon consideration of all

the relevant circumstances, the Court declines to set aside the default judgment.

## ANALYSIS[1]

Relief from a final judgment under Rule 60(b) is an extraordinary remedy "which

may be granted only upon an adequate showing of exceptional circumstances."  *Williams*

*v. York*, 891 F.3d 701, 706 (8th Cir. 2018) (citation omitted).  Relevant here, a district court

may grant relief from a default judgment under Rule 60(b) because of a party's "excusable

neglect."  Fed. R. Civ. P. 60(b)(1).  "The determination of excusable neglect 'is at bottom

an equitable one, taking account of all relevant circumstances surrounding the party's

---

[1]    The Court incorporates the factual background set forth in the order granting IMI's motion for default judgment.  *See* ECF No. 101 at 2–11.  The Court need not traverse those facts for purposes of resolving Defendants' motion to set aside the default judgment.

omission.'" *Feeney v. AT & E, Inc.*, 472 F.3d 560, 562–63 (8th Cir. 2006) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 395 (1993)).

Defendants contend that their failure to actively or meaningfully participate and appropriately defend themselves in this case was due to excusable neglect, which warrants vacating the default judgment and reopening this matter. *See* ECF No. 107 at 9–21. For the reasons discussed below, the Court disagrees.

## I.     Excusable Neglect

Securing a default judgment is a two-step process. First, the party seeking default judgment must apply for entry of default from the Clerk of Court. *See* Fed. R. Civ. P. 55(a). Second, "[o]nly after an application is made, and granted under Rule 55(a), can a plaintiff seek a Default Judgment" under Rule 55(b). *Armstrong v. Astrue*, 569 F. Supp. 2d 888, 895 n.6 (D. Minn. 2008).

Notably, Rule 55(c) provides that a district court may set aside the initial entry of default "for good cause," but may only "set aside a final default judgment under Rule 60(b)." Fed. R. Civ. P. 55(c). And while "the same factors are typically relevant" in deciding whether to set aside an entry of default under Rule 55(c) and a default judgment under Rule 60(b), "relief from a default judgment requires a stronger showing of excuse than relief from a mere default order." *Johnson v. Dayton Elec. Mfg. Co.*, 140 F.3d 781, 783 (8th Cir. 1998) (citation modified). This is because "it is likely that a party who promptly attacks an entry of default, rather than waiting for grant of a default judgment, was guilty of an oversight and wishes to defend the case on the merits." *Id.* Here, Defendants waited until after default judgment was entered to seek any relief from the

Court, so Defendants must make "a stronger showing of excuse" to justify setting aside the default judgment. *Id.* (citation omitted).

Courts consider several factors when determining whether a defaulting party's neglect is sufficiently excusable to set aside a default judgment, including: (1) the danger of prejudice to the non-moving party; (2) the length of the delay and its potential impact on judicial proceedings; (3) whether the moving party acted in good faith; and (4) the reason for the delay, including whether it was within the reasonable control of the moving party. *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 496 F.3d 863, 866 (8th Cir. 2007) (citing *Pioneer Inv. Servs.*, 507 U.S. at 395). These factors "do not carry equal weight; the reason for delay is a key factor in the analysis." *U.S. Commodity Futures Trading Comm'n v. Kratville*, 796 F.3d 873, 896 (8th Cir. 2015) (citation omitted). In addition, "the existence of a meritorious defense" is a relevant factor. *Giles v. Saint Luke's Northland-Smithville*, 908 F.3d 365, 368 (8th Cir. 2018) (citation omitted).

### A.    Danger of Prejudice to IMI

Prejudice generally "may not be found from delay alone or from the fact that the defaulting party will be permitted to defend on the merits." *Johnson*, 140 F.3d at 785. Rather, the nonmoving party must be prejudiced "in a more concrete way, such as loss of evidence, increased difficulties in discovery, or greater opportunities for fraud and collusion." *Id.* (internal quotation marks omitted) (citation omitted).

Strictly as it relates to issues in discovery, the Court believes there is little danger of prejudice to IMI. IMI is understandably exasperated by Defendants' conduct during discovery in this case, *see* ECF No. 112 at 9–10, but the Court does not discern any

4

substantial risk that evidence has been or would be lost. Further, Defendants, "now represented by counsel," represent that they "fully plan" to correct their prior discovery deficiencies if the Court sets aside the default judgment. ECF No. 107 at 11. IMI asserts that "[s]ignificant discovery will be required, including numerous depositions," ECF No. 112 at 15, but it is not apparent that IMI would face greater difficulties in discovery if Defendants remedied their previous discovery deficiencies.

IMI argues, however, that it is also prejudiced because Defendants' infringing conduct has continued despite the Court ordering Defendants to cease such conduct. *See* ECF No. 112 at 14; *see also* ECF No. 111 at 3. The Court shares IMI's concern. Although the Eighth Circuit in *Johnson* rejected "expectations concerning the judgment" as a standard for assessing prejudice, 140 F.3d at 785, it did so in the context of determining whether to set aside an entry of default, not a default judgment, *id.* at 783. Importantly, the Eighth Circuit determined that the defaulting party in *Johnson* was "entitled to the more lenient 'good cause' standard" under Rule 55(c), not the "more stringent standard" for excusable neglect under Rule 60(b)(1). *Id.* at 784. Given that framing, the Eighth Circuit explained that "[e]ntry of default raises no protectable expectation that a default judgment will follow" because "a party's belief in the integrity of the system must include, to be reasonable, knowledge that a system of integrity makes exceptions 'for good cause shown.'" *Id.* at 785.

In contrast, by the time Defendants filed their Rule 60(b) motion to set aside the default judgment here, IMI certainly had reasonable expectations concerning the judgment's finality and operation. Defendants did not timely appeal the default judgment.

5

*See* Fed. R. App. P. 4(a)(1)(A). Nor did Defendants file a motion under Rule 59(e) to alter or amend the judgment, which would have "suspend[ed] the finality" of the judgment for purposes of appeal. *Banister v. Davis*, 590 U.S. 504, 508 (2020) (citation omitted). It is, therefore, reasonable for IMI to have believed the judgment was and would remain final and effective, even if Defendants later sought relief from the judgment, as they do here. *See* Fed. R. Civ. P. 60(c)(2) (stating that the filing of a motion under Rule 60(b) "does not affect the judgment's finality or suspend its operation"). Further, Defendants waited to file their Rule 60(b) motion until the date on which they were to certify their compliance with the permanent injunction entered by this Court as part of the judgment. *See* ECF No. 101 at 38; ECF No. 111. But Defendants have not fully complied with the permanent injunction and, in fact, openly declare their intention not to fully comply with the injunction until the Court rules on their Rule 60(b) motion. *See* ECF No. 111 at 3. Defendants do so notwithstanding the language of Rule 60(c)(2). That alone constitutes prejudice to IMI. *See P.S. Prods., Inc. v. Unique Cutlery, Inc.*, No. 4:09-cv-00664 SWW, 2010 WL 728978, at *3 (E.D. Ark. Feb. 25, 2010) (finding prejudice and declining to grant relief from default judgment where defaulting party "continue[d] to offer illegal copies of plaintiffs' product for sale" after judgment was entered).

The Court might be persuaded that this factor weighs in Defendants' favor if the potential prejudice to IMI consisted only of discovery issues and concern that Defendants would be permitted to defend themselves on the merits. *See Johnson*, 140 F.3d at 785. But that is not the case here. It would be prejudicial to IMI to reopen this matter and require IMI to continue prosecuting a case it reasonably believed had concluded, especially

6

considering Defendants' admitted noncompliance with the very judgment from which they seek relief. *See P.S. Prods.*, 2010 WL 728978, at *3.

## B.    Length of Delay and Impact on Proceedings

Defendants characterize their delay as "brief" and contend their "prompt filing" of their Rule 60(b) motion "weighs against a finding of excusable neglect." ECF No. 107 at 11–12. The Court strongly disagrees. More than seven months passed between when Defendants' initial counsel withdrew and when the Court took IMI's motion for default judgment under advisement. ECF No. 101 at 11–14. In that time, Defendants refused to participate in discovery, failed to answer IMI's amended complaint, failed to respond or object to the Clerk's entry of default, failed to respond to IMI's motion for default judgment, and failed to meaningfully respond to two separate orders of this Court to show cause why default judgment should not be entered. *Id.* This case effectively stalled from the start, and Defendants "watched the litigation from afar for over seven months, apparently without any intention of . . . defending the action in a legally cognizable manner." *Hall v. T.J. Cinnamon's, Inc.*, 121 F.3d 434, 435 (8th Cir. 1997). Only once the consequences for Defendants' failure to participate in this litigation were imminent did Defendants obtain counsel, ECF No. 105—almost one year after IBW was expressly ordered to do so, ECF No. 41—and file their Rule 60(b) motion. Accordingly, the Court finds that Defendants' conduct and delays substantially impacted these proceedings.

## C.    Whether Defendants Acted in Good Faith

Generally, "excusable neglect" is "understood to encompass situations in which the failure to comply with a filing deadline is attributable to negligence." *Union Pac. R.R. v.*

7

*Progress Rail Servs. Corp.*, 256 F.3d 781, 782 (8th Cir. 2001) (quoting *Pioneer Inv. Servs.*, 507 U.S. at 394).  "To be excusable, however, the neglect must be accompanied by a showing of good faith and some reasonable basis for not complying with the rules."  *Noah v. Bond Cold Storage*, 408 F.3d 1043, 1045 (8th Cir. 2005) (per curiam).

Defendants plainly have not acted in good faith over the course of this litigation. For example, nearly two months after Defendants missed the deadline to respond to IMI's interrogatories, counsel for IMI met and conferred with Eguia (who was then acting pro se) and corresponded with Eguia afterwards to memorialize their discussion, including counsel's understanding that Eguia would respond to the interrogatories that day.  ECF No. 82-7 at 5–6.  The next day, despite having been served the interrogatories nearly three months earlier, Eguia responded that he needed the interrogatories "streamlined a bit better" like he was "3 years old," that he did not "need the lawyer talk," and that IMI should "only send [him] questions and or requests [it] still need[ed] answers to."  *Id.* at 4–5. Counsel for IMI declined to rewrite the interrogatories but identified the specific requests Defendants either had not answered or to which Defendants' previous answers were deficient.  *Id.* at 3.  Rather than provide answers, Eguia responded, "Why not just set up a deposition then?"  *Id.* at 2.  In other words, Eguia understood his discovery obligations and promised to remedy the deficiencies in his discovery responses, then refused to do so.  In fact, after his initial counsel withdrew, Eguia never provided responses to IMI's interrogatories or to any other outstanding discovery requests, nor did he ever attempt in good faith to remedy his discovery deficiencies.  *See* ECF No. 82 ¶¶ 14, 21.

Not only did Defendants fail to meaningfully respond to IMI, but they also failed to meaningfully engage with the Court. First, Defendants failed to respond to either the Clerk's entry of default or to IMI's motion for default judgment. ECF No. 101 at 13. Then, on July 2, 2025—more than two months later—the Court made "a last-ditch effort to secure [Defendants'] participation" by specifically ordering Defendants to "show cause as to why the Court should not grant IMI's motion for default judgment." ECF No. 95 at 3. Three days after the deadline to respond passed, Eguia submitted an email citing a family emergency as the reason for his untimely response. ECF No. 97. But that family emergency, by Eguia's own admission, did not arise until *after* the Court's July 2 order, meaning that it could not in any way explain Eguia's lack of meaningful participation in the litigation over the preceding eight months. *See* ECF No. 101 at 13. In short, Eguia's email provided no rationale that would explain why the Court should not enter default judgment. That is to say nothing of the continuing neglect of IBW to secure counsel.

Nevertheless, the Court entered a second order to show cause on July 21, 2025, explained to Eguia that his response was insufficient, and offered Eguia a second opportunity to meaningfully respond to the Court's order. ECF No. 98 at 1–2. Eguia responded—again after the Court's deadline passed—citing the same family emergency, adding that he was busy planning an unspecified event, and stating that he could resume his participation in the litigation after August 18, 2025. ECF No. 99. Again, this email offered no explanation for his previous failure to engage in the litigation. And as to Eguia's assertion that he could only begin to participate with this litigation on August 18, 2025, the Court notes that Defendants' 2025 "Indian Bike Week" event was scheduled to conclude

on that date.  *See* Indian Bike Wk., https://perma.cc/Z7LF-AMNG.  It appears Eguia effectively asked the Court to stay the litigation so he could continue to focus all his efforts on planning and putting on a motorcycle rally that is at the heart of IMI's allegations of trademark infringement.[2]  Eguia does not attempt to explain why the family emergency that, as he represented to the Court, prevented him from participating in this litigation during the months of July and August did not also prevent him from planning and participating in his August 2025 "Indian Bike Week" event.

More compellingly, Defendants waited to file their Rule 60(b) motion until the date on which they were ordered to certify their compliance with the permanent injunction entered by this Court, which required, among other things, that Defendants "destroy or remove all advertisements or promotional materials" that use "the name 'Indian Bike Week.'"  ECF No. 101 at 38.  Despite this clear order, Eguia filed a declaration on Defendants' behalf in which he states: "Defendants continue to use the phrase 'Indian Bike Week' because the settlement agreement between the parties allowed Defendants to use the phrase 'Indian Bike Week,' and IMI had previously approved a logo that used the phrase 'Indian Bike Week,' **which the Court specifically noted in its order.**"  ECF No. 111 at 3 (emphasis in original).  Eguia further stated that Defendants will continue to use the name "Indian Bike Week" until Defendants' motion to vacate the judgment is resolved.  *Id.*  In other words, despite being ordered to stop using the infringing phrase, Eguia continues to

---

[2]    Eguia personally attended the hearing on Defendants' motion to vacate the default judgment.  When the Court asked Defendants' counsel if Defendants' 2025 "Indian Bike Week" rally was the unspecified event referenced in Eguia's email, ECF No. 99 at 2, Eguia nodded in the affirmative.

do so because he does not believe the Court should have made such an order. That is plainly not within Eguia's power to decide, and the filing of a motion under Rule 60(b) "does not affect the judgment's finality *or suspend its operation*." Fed. R. Civ. P. 60(c)(2) (emphasis added). Further, Eguia's legal reasoning, which he appears to believe supersedes the Federal Rules of Civil Procedure and this Court's express order, is fundamentally flawed. Eguia conspicuously neglects to mention that the Court found him to have breached the settlement agreement on which he relies, *see* ECF No. 101 at 19–20, and "it is elementary that a breach of a contract by one party excuses performance by the other," *Soderbeck v. Ctr. for Diagnostic Imaging, Inc.*, 793 N.W.2d 437, 441 (Minn. Ct. App. 2010) (citation modified). In essence, Eguia wants IMI to honor its obligations under the settlement agreement even though he utterly failed to honor *his* obligations under the same agreement. That is not how contracts work. *See id.* Defendants, by their own admission, are in violation of the permanent injunction entered by this Court.

In sum, Defendants never formally sought a stay of this litigation. Defendants never informed the Court of any circumstances that could justify their lack of participation in this case until ordered to do so (and then offered only inadequate excuses). Defendants did not appeal the judgment entered in this matter. And Defendants now openly flout an order of this Court. It should go without saying that this conduct does not demonstrate an effort to act in good faith. Quite the opposite. Defendants have shown themselves to be dismissive, disrespectful, and defiant toward both the Court and to IMI. And the fact that Eguia was represented by counsel when he submitted his declaration of "compliance"—in which he proclaims, based on a specious legal theory, that Defendants *have not* complied and *will*

*not* comply with the plain terms of the injunction until their motion is decided—is deeply troubling and weighs heavily against a finding of good faith or excusable neglect. *See P.S. Prods.*, 2010 WL 728978, at *3.

### D.  Reason for Delay

Defendants' argument as to the reason for their delay—the "most important factor," *Giles*, 908 F.3d at 369—fares no better. Defendants cite Eguia's financial issues, various family emergencies, and his previous pro se status as "good reason" for the delays which stalled this case in its infancy. ECF No. 107 at 12. None of those reasons adequately explains Defendants' conduct in this case.

To be clear, the circumstances Eguia describes relating to his family emergencies are serious, *see* ECF No. 117, and the Court does not intend to minimize them. But the Court already explained that the emergencies were an insufficient excuse for why Defendants ceased defending themselves in an appropriate and legally cognizable way in the months before they arose. ECF No. 101 at 17. Indeed, even now, Eguia offers no reason (other than his pro se status) why he refused to substantively respond to IMI's discovery requests beginning in January 2025, did not answer IMI's amended complaint in March 2025, and did not respond to the Clerk's entry of default in the almost one month between when it was entered and when IMI filed its motion for default judgment. And IBW, for its part, offers no explanation (other than Eguia's personal financial difficulties) for why it did not secure counsel as ordered in January 2025.

At best, Eguia's explanations illuminate his failure to respond to IMI's motion for default judgment. But even so, he offers no plausible reason why he did not raise these

12

issues much sooner or seek a stay of this litigation to attend to them. *See Trs. of Minn. & N.D. Bricklayers & Allied Craftworkers Fringe Benefit Funds v. E & R Masonry Constr., Inc.*, No. 05-cv-54 (DSD/SRN), 2006 WL 2571270, at *2 (D. Minn. Sept. 5, 2006) ("Even assuming defendants' naivete in attending to legal matters, they failed to make the simplest of inquiries or respond to clear orders of the court."). It was not until after the Court issued two separate orders to show cause why default judgment should not be entered against Defendants that Eguia even hinted at the idea of staying the litigation. *See* ECF No. 99. And as noted, Eguia conspicuously requested that the litigation be delayed until after the exact date on which Defendants' 2025 "Indian Bike Week" event was scheduled to conclude. The Court cannot overlook that suspect timing.

The fact that Eguia was acting pro se does not excuse him from complying with the Court's orders and the Federal Rules of Civil Procedure. *Ackra Direct Mktg. Corp. v. Fingerhut Corp.*, 86 F.3d 852, 856 (8th Cir. 1996). And Rule 60(b)(1) does not permit Eguia to "evade the consequences" of his "litigation strategies," *Kratville*, 796 F.3d at 896 (citation omitted).[3] As the Court previously stated, "Defendants' conduct extend[ed] beyond mere 'marginal failure[s] to comply with time requirements' and venture[d] into 'willful violations of court rules, contumacious conduct, [and] intentional delays.'" ECF

---

[3] It is worth noting that Eguia is no stranger to litigation. Indeed, another of his solely owned companies was a represented party in a separate matter decided by this very Court while this matter was pending. *See El Camino, LLC v. City of South Saint Paul*, No. 23-cv-3011 (LMP/DLM), 2025 WL 1615695, at *1–5 (D. Minn. June 6, 2025); *see also Thompson v. R.J. Reynolds Tobacco Co.*, 760 F.3d 913, 918 (8th Cir. 2014) ("A district court may properly take judicial notice of items in the public record, such as judicial opinions.").

No. 101 at 17–18 (second alteration in original) (quoting *Ackra Direct*, 86 F.3d at 856). Despite asking this Court for relief from the judgment entered in this case, Defendants' noncompliance continues to this day. For these reasons, the Court concludes that this factor weighs strongly in IMI's favor.

### E.     Existence of a Meritorious Defense

Whether a meritorious defense exists is determined by examining "whether the proffered evidence would permit a finding for the defaulting party." *Stephenson v. El-Batrawi*, 524 F.3d 907, 914 (8th Cir. 2008) (internal quotation marks omitted) (citation omitted). The Court, however, "must have before it more than mere allegations that a defense exists," and "simple assertions unsupported by specific facts or evidence" are insufficient to satisfy the burden of showing why a default judgment should be set aside. *Id.* (citation omitted). The "underlying concern" is whether there is some possibility that the "result achieved by the default" would be contrary to the outcome "after a full trial" on the merits. *Id.* (citation omitted).

Defendants' assertion that they have a meritorious defense is based generally on (1) evidence that they contend shows there is no likelihood of confusion between IMI's and Defendants' marks, and (2) legal argument concerning the Court's analysis of the likelihood-of-confusion factors for IMI's Lanham Act claims. *See* ECF No. 107 at 13–21. Neither argument is persuasive.

### 1. Evidentiary Argument

### a. IMI's Relationship with Adam Sandoval

Defendants cite a YouTube video posted on September 15, 2025, by Adam Sandoval, a social media influencer who attended Defendants' 2025 "Indian Bike Week" rally.[4] ECF No. 107 at 3–4, 16–17. Citing various statements made by Sandoval in the video, Defendants assert that "IMI corporate provided a motorcycle to Adam Sandoval so that he could attend the 2025 IBW event" as a representative of IMI. *Id.* at 16–17. Defendants also note that IMI posted a video on its Facebook page on August 29, 2025, that features Sandoval "while he was attending IBW."[5] ECF No. 116 at 15. According to Defendants, these videos show that Defendants' "rally and merchandise sale does not create confusion or divert customers," ECF No. 107 at 16, and "suggests that IMI was intentionally trying to capitalize on the goodwill generated by the IBW event," *id.* at 4.

IMI responds that Defendants' argument "ignores the relevant facts." ECF No. 112 at 12. IMI cites the sworn declaration of Taylor Young, the Brand Marketing Manager at IMI's parent corporation, Polaris Industries Inc. ("Polaris"). ECF No. 114 ¶ 3. In that role, Young is "responsible for marketing efforts pertaining to brand media and content marketing strategies for the Indian Motorcycle brand," which includes "engaging with

---

[4] *See* Adam Sandoval, *EVERY Indian Rider Needs to See this NOW* (YouTube, Sept. 15, 2025), https://www.youtube.com/watch?v=BfHKBBS_dNA.

[5] *See* Video posted by Indian Motorcycle, Facebook (Aug. 29, 2025), https://www.facebook.com/indianmotorcycle/videos/as-told-by-our-friend-adam-sandoval-scootinamerica-125000-miles-125-days-one-mis/1851470995784576/.

digital media content creators" like Sandoval. *Id.* ¶ 4. Young discusses Polaris's "informal relationships with motorcycle influencers," like Sandoval, who have no contractual relationship with Polaris and to whom Polaris "regularly loans its motorcycles" for promotion purposes. *Id.* ¶¶ 6, 8. As part of these informal relationships, "Polaris does not condition its loans on what the motorcycle will be used for, where the influencer will ride the motorcycle, or what events the influencer will attend" and "cannot control where or how the influencer uses the motorcycle." *Id.* ¶ 7. Young states that Sandoval contacted her "in the early summer of 2025 requesting to borrow an Indian motorcycle," to which Polaris agreed. *Id.* ¶ 9. She further states that Polaris "did not condition the loan" on Sandoval's "attendance at any events" and "did not ask [him] to attend Indian Bike Week, insinuate that he should do so, or condition the loan on [his] attendance at Indian Bike Week." *Id.* ¶¶ 9–10.

The Court finds IMI's explanation compelling. Young has direct, firsthand knowledge of IMI's relationship with Sandoval and states unequivocally that, contrary to Defendants' unsupported assertion, neither Polaris nor IMI "provided a motorcycle to Adam Sandoval *so that he could attend the 2025 IBW event*." ECF No. 107 at 17 (emphasis added). Defendants offer no direct evidence to rebut Young's declaration—for example, a sworn declaration from Sandoval himself contradicting Young's account—and instead rely on conclusory assertions based on a handful of stray remarks in Sandoval's more than twelve-minute-long video.[6] *See id.* at 3–4, 16–17.

---

[6] Defendants also briefly assert that that the default judgment should be vacated under Rule 60(b)(3)—which applies in cases of "fraud . . . misrepresentation, or misconduct by

Defendants' reliance on the video IMI posted on its corporate Facebook page is also misplaced. The Court has reviewed the video, and it contains only a discussion between Sandoval and Patrick Cornell, who was loaned an Indian motorcycle to raise awareness for myotonic muscular dystrophy. *See supra* at 15 n.5. At no point in that video does Sandoval or Cornell ever mention Defendants' "Indian Bike Week" rally, nor is there any other indication in the video that they were at the rally. *See id.*

### b.    Affidavits by Rally Attendees

Defendants also submit and rely heavily on more than 100 "affidavits" from attendees of their 2024 "Indian Bike Week" event to prove that there were no incidents of actual confusion between IMI's and Defendants' respective goods and services. *See* ECF No. 107 at 14–15; *see generally* ECF No. 108-1. But the Court already concluded that there was no evidence of actual confusion, explained that the lack of such evidence was not dispositive as to the issue of likelihood of confusion, and weighed that factor in Defendants' favor. *See* ECF No. 101 at 25. In other words, Defendants already received the benefit of the fact that there was no evidence of actual confusion, but even that did not "permit a finding" for Defendants. *Stephenson*, 524 F.3d at 914. Furthermore, at least six

---

an opposing party," Fed. R. Civ. P. 60(b)(3)—because IMI did not disclose its relationship with Sandoval to the Court, ECF No. 107 at 17. To prevail under Rule 60(b)(3), the moving party must establish by "clear and convincing evidence" that the "adverse party engaged in fraud or other misconduct and that this conduct prevented the moving party from fully and fairly presenting its case." *Cook v. City of Bella Villa*, 582 F.3d 840, 855 (8th Cir. 2009) (citations omitted). Further, a finding of fraud "is justified only by the most egregious misconduct directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel." *In re Veg Liquidation, Inc.*, 931 F.3d 730, 738–39 (8th Cir. 2019). There is no evidence, much less clear and convincing evidence, that IMI or its counsel engaged in such conduct here.

of the affidavits submitted by Defendants show that the respondents believed Defendants'

"Indian Bike Week" events and related goods *are* affiliated with IMI, or that the name

"Indian Bike Week" *does* cause confusion as to an affiliation between IMI and IBW.[7]  *See*

ECF No. 108-1 at 60–61, 77, 87, 107, 115.

In sum, the Court concludes that none of the evidence cited by Defendants would

permit a finding in their favor or raises a meaningful possibility that they could achieve a

different outcome after a trial than the result achieved by the default.  *Stephenson*, 524 F.3d

at 914.

### 2.    Legal Arguments

The remainder of Defendants' argument consists merely of Defendants'

disagreements with the Court's legal analysis under the Lanham Act and weighing of the

likelihood-of-confusion factors.  *See* ECF No. 107 at 17–21.  But relief under Rule 60(b)

"is not available as a substitute for appeal," *United States v. Young*, 806 F.2d 805, 806

(8th Cir. 1986), or "for other legal remedies," *Nucor Corp. v. Neb. Pub. Power Dist.*,

999 F.2d 372, 374 (8th Cir. 1993).  Defendants did not timely appeal the default judgment

---

[7]    The Court also notes that statements made by some of the affiants raise significant questions of bias and credibility.  For example, one affiant who indicated she did not believe there was affiliation between IMI and IBW or that the name "Indian Bike Week" causes confusion between IMI and IBW's respective goods and services wrote, "You should be supporting this effort instead of causing trouble.  It makes you look bad like a greedy corporation."  ECF No. 108-1 at 54.  It is reasonable to presume that "you" refers to IMI, and "trouble" refers to this lawsuit, which suggests this affiant, and likely others, were not acting as neutral parties for purposes of Defendants' purported survey.  Moreover, it is entirely unclear who administered the survey, under what conditions the survey was administered, what parameters were established for the survey, and, crucially, whether other survey responses less favorable to Defendants were omitted from Defendants' submission to the Court.

or pursue other legal remedies, like a Rule 59(e) motion to alter or amend the judgment. *See* Fed. R. App. P. 4(a)(1)(A) (stating a notice of appeal must be filed "within 30 days after entry of the judgment or order appealed from"); Fed. R. Civ. P. 59(e) (stating a motion to alter or amend a judgment "must be filed no later than 28 days after the entry of the judgment"). For this reason alone, the Court rejects Defendants' argument.

In any event, Defendants' argument is often self-defeating and internally inconsistent. For example, Defendants state that IMI's and Defendants' "products do not compete with each other" while acknowledging, one sentence later, that the parties' products and services "overlap to some extent." ECF No. 107 at 16. Defendants also argue that they "do not intend to pass their goods as IMI's," *id.* at 20, but state elsewhere that Defendants' "Indian Bike Week" event "draws positive attention to IMI, enhances the company's visibility, and provides an opportunity to expand its customer base," *id.* at 16. If anything, that supports the conclusion that attendees of Defendants' "Indian Bike Week" events do, in fact, associate "Indian Bike Week" with IMI and its goods and services, and that this false suggestion of association was, in fact, Defendants' intention in hosting their events under that name.

Defendants also assert that the Court "never analyzed the stand-alone phrase 'Indian Bike Week'" for likelihood of confusion with IMI's trademarks. ECF No. 116 at 6. This misrepresents the Court's analysis. The Court made clear that Defendants' use of "Indian Bike Week" in association with their goods and services was the central issue in this case. *See* ECF No. 101 at 23–26. And the Court concluded that "the marks used by Defendants are remarkably similar, if not identical, in overall appearance, sound, and meaning" to

19

IMI's marks. *See id.* at 23. Defendants appear to suggest that because the standalone phrase "Indian Bike Week" is not, by itself, identical to any of IMI's trademarks, there can be no likelihood of confusion. *See* ECF No. 116 at 6. That misapprehends the way courts are to analyze likelihood of confusion. *See Calvin Klein Cosmetics Corp. v. Lenox Lab'ys, Inc.*, 815 F.2d 500, 504–05 (8th Cir. 1987) (cautioning against "putting too much stock in a subjective inspection done in-chambers that is devoid of market characteristics" because a "realistic evaluation of consumer confusion must attempt to recreate the conditions in which buying decisions are made"); *accord Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, 156 F.4th 1259, 1280–81 (Fed. Cir. 2025) (quoting *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 538 (2d Cir. 2005)) ("[U]nder the Lanham Act, courts are required 'to analyze the similarity of the products *in light of the way in which the marks are actually displayed* in their purchasing context.'"). And it is well established that an alleged infringer's mark and the trademark owner's mark need not be strictly identical to support a finding of infringement. *See, e.g.*, *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 144 (2015) ("The owner of a mark, whether registered or not, can bring suit [under the Lanham Act] if another is using a mark that *too closely resembles* the plaintiff's." (emphasis added)); *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980) ("Where the products are closely related, less similarity in the trademarks is necessary to support a finding of infringement.").

Finally, Defendants assert that they have a meritorious defense as it relates to IMI's breach of contract claim because IMI authorized Eguia to use the name "Indian Bike Week" in their prior settlement agreement. ECF No. 107 at 21. That is true insofar as IMI

20

authorized Eguia to use a single design bearing the phrase "Indian Bike Week." *See* ECF No. 101 at 8. It is also irrelevant. For starters, the Court's determination that Eguia breached the settlement agreement was not based on his use of the name "Indian Bike Week," so the fact that he was at one point authorized to use that phrase on that single design does not alter the Court's analysis. *See* ECF No. 101 at 19–20. That aside, as part of the settlement agreement, IMI agreed to release any claims relating to Eguia's unauthorized use of its trademarks that predated the agreement—which includes Eguia's use of the name "Indian Bike Week" to promote Defendants' rallies, *see* ECF No. 69 at 162–65—on the condition that Eguia "complied with [his] obligations" under the agreement, *id.* at 209. Eguia has made no effort to do so. *See* ECF No. 101 at 19–20. Upon Eguia's breach, IMI no longer was obligated to continue allowing Eguia to use the design it approved or, for that matter, any other mark or design that is confusingly similar to IMI's marks. *See Soderbeck*, 793 N.W.2d at 441.

At bottom, none of the arguments and evidence raised by Defendants is sufficient to "permit a finding" in their favor. *Stephenson*, 524 F.3d at 914. The Court therefore concludes that Defendants have not demonstrated a meritorious defense that is sufficient to warrant setting aside the default judgment. And considering the Court's findings as to the other relevant factors and the circumstances in this case, the Court finds that Defendants have not demonstrated excusable neglect. Accordingly, Defendants' motion to vacate the default judgment is denied.

## II.    Defendants' Noncompliance with the Permanent Injunction

As a final matter, Defendants openly acknowledge that they are in violation of the permanent injunction entered by this Court, despite its plain terms and the clear language of Rule 60(c)(2). *See* ECF No. 111 at 3. This is another example of Eguia's noncompliance throughout the course of these proceedings. Eguia's conduct must cease immediately. Accordingly, in addition to denying Defendants' motion to vacate the default judgment, the Court also orders Defendants to certify their full and unconditional compliance with the permanent injunction entered in this case within fourteen days of the date this Order is entered. If Defendants fail to certify their compliance with the Court's order, the Court will schedule a hearing in which Eguia will be required to personally appear and to show cause why he and IBW should not be held in contempt for Defendants' willful violation of the Court's order.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings in this matter, **IT IS HEREBY ORDERED** that:

1.    Defendants' Motion to Vacate Default Judgment (ECF No. 106) is **DENIED**;

2.    Within 14 days of the date of this Order, Defendants must certify, in writing and under penalty of perjury, their full and unconditional compliance with the permanent injunction entered by the Court on September 5, 2025 (ECF No. 101); and

3.    If Defendants fail to timely certify their compliance with the permanent injunction as set forth above, the Court will schedule a hearing in which

22

Eguia will be required to personally appear and show cause why he and IBW should not be held in contempt, including why sanctions should not be imposed, for Defendants' willful violation of the Court's order.

Dated: March 18, 2026

_s/Laura M. Provinzino_
Laura M. Provinzino
United States District Judge